**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HFT SOLUTIONS, LLC, | |
| *Plaintiff/Counterclaim Defendant,* | Case No. 1:24-cv-13214 |
| v. | Hon. John J. Tharp, Jr. |
| JUMP TRADING LLC, | Hon. Daniel P. McLaughlin |
| *Defendant/Counterclaim Plaintiff.* | JURY TRIAL DEMANDED |

**PLAINTIFF HFT SOLUTIONS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND OF THE '305 PATENT ...................................................... 2

III.   LEGAL STANDARDS ................................................................................. 5

IV.    DISPUTED TERMS ..................................................................................... 5

       A.     "Configured To" ............................................................................... 5

       B.     "Operationally Connected To" ........................................................ 6

V.     CONCLUSION ........................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012)..................................................................................... 5

*Bonutti Research, Inc. v. Lantz Med., Inc.*,
1:14-cv-00609, 2016 WL 247752 (S.D. Ind. Jan. 21, 2016) ...................................... 10

*Embrex, Inc. v. Breuil, SA*,
2005 WL 8159294 (E.D.N.C. Nov. 18, 2005)............................................................. 10

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)..................................................................................... 5

*Hunter Douglas Inc. v. Great Lake Woods, Inc.*,
17 Markman 11673680, 2017 WL 11673680 (D. Colo. 2017) ..................................... 7

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)..................................................................................... 7

*INVT SPE LLC v. Int'l Trade Comm'n*,
46 F.4th 1361 (Fed. Cir. 2022) ..................................................................................... 4

*Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson*,
No. 2:22-cv-00282-JRG-RSP, Dkt. No. 176 (E.D. Tex. Oct. 14, 2023) ..................... 4

*Nevro Corp. v. Boston Scientific Corp.*,
955 F.3d 35 (Fed. Cir. 2020)......................................................................................... 5

*Oplus Techs., Ltd., v. Funai Elec. Co., Ltd.*,
No 11-cv-09027 (Sept. 13, 2013) .................................................................................. 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)..................................................................................... 5

*Polaris PowerLED Tech., LLC v. Samsung Electronics America, Inc.*,
No. 2:17-cv-00715, Dkt. No. 333 (E.D. Tex. June 7, 2026)......................................... 4

*Radware Ltd. v. A10 Networks, Inc.*,
No. C-13-02024-RMW, 2014 WL 1572644 (N.D. Cal. Apr. 18, 2014)....................... 4

*SIPCO, LLC. v. Abb, Inc.*,
No. 6:11-cv-0048-LED-JDL, 2012 WL 3112302 (E.D. Tex. July 30, 2012)............... 4

*Stryker Corp. v. Zimmer, Inc.*,
1:10-cv-1223, 2012 WL 333814 (W.D. Mich. Feb. 1, 2012) ....................................... 5

Thorner v. Sony Computer Entm't Am. LLC,
669 F.3d 1362, 135 (Fed. Cir. 2012)......................................................................... 5, 2

*Traveller Innovations Ltd. v. Evenflo Co., Inc.*,
No. 24-cv-1204, 2026 WL 161354 (D. Del. Jan. 21, 2026) ......................................... 5

*World Wide Stationery Mfg. Co. Ltd. v. U.S. Rung Binder, L.P.*,
4:07-cv-1947, 2009 WL 2982904 (E.D. Miss. Sept. 14, 2009)..................................... 9

## I.    INTRODUCTION

This should be a straightforward case. Both parties agree that the two disputed terms— "configured to" and "operationally connected to"—are well-understood phrases that carry their plain and ordinary meaning to a person of ordinary skill in the art. Dkt. No. 54 at 9, 11. And while the parties are close in their understanding of the plain and ordinary meanings of those two terms, Jump Trading's proposed constructions inject uncertainty into the meanings and overly limit the claims. Indeed, from its opening brief, Jump Trading seems to further narrow the claimed terms beyond its own proposed constructions and well beyond the plain and ordinary meaning.

HFT agrees that "configured to" should be accorded its plain and ordinary meaning, and should the Court find construction necessary, define the term as "programmed or implemented with hardware or software to." Jump Trading's proposed construction, while similar, includes the term "actually" beforehand. In briefing, Jump Trading placed emphasis on "actually" (Dkt. No. 54 at 9), implying that "actually programmed or implemented to" is different from simply "programmed or implemented to." This additional term confuses the claim term and proposed construction and appears to be an improper attempt to further limit the claim without support in the intrinsic record.

With respect to "operationally connected to," HFT largely agrees with Jump Trading's proposed construction, but seeks to make clear that the proposed construction allows for both direct and indirect connections, such that the term should be construed as "connected, directly or indirectly, such that the connection allows the performance of the recited function." Moreover, Jump Trading places additional constraints on the meaning of "operationally connected to," beyond even its proposed construction. In particular, Jump Trading alleges that the claim term excludes "a generic physical or electrical connection," and also that the claimed connection is "for

the express purpose of transmitting signals and performing specific functions." Dkt. No. 54 at 11-12. These extra-textual limitations are not supported by either the proposed construction or the intrinsic record and should be rejected.

Thus, HFT respectfully requests that the Court find the two contested terms are governed by their plain and ordinary meaning and either find no further construction is needed, or adopt HFT's proposed constructions and reject Jump Trading's attempts to narrow the claims beyond the plain and ordinary meaning.

## II.     BACKGROUND OF THE '305 PATENT

The two disputed terms appear in U.S. Patent No. 11,128,305 (the "'305 patent"). The '305 patent is directed to a field programmable gate array ("FPGA") system used in the financial trading context. An FPGA is an integrated circuit (or computer chip) that can be programmed to perform specific functions or execute software commands. As described in the patent, FPGAs "may be used in applications that require fast processing since FPGAs allow for all computations to occur on a single chip." JA-29 at 1:34-37. In particular, the '305 patent describes the use of FPGA applications in the financial industry, including high frequency trading. In this context, the "rapid processing of the FPGA is desired" (*id.* at 1:37-39) and latencies (or delays) of even a nanosecond can be catastrophic. *Id.* at 1:42-48.

The '305 patent addresses a technological problem that arises in high-speed FPGA applications, where latencies, or delays, can be introduced due to clock misalignment, where the receiver side clock and the transmitter side clock are not synchronized. *Id.* at 1:39-41. The prior art sought to solve this problem by including a clock domain crossing circuit in the FPGA, but these circuits inherently add delay to the circuit's processing and can hinder the FPGA's performance. *Id.* at 1:42-48.

The '305 patent solves this problem by utilizing an ***external*** phase-locked control architecture in lieu of clock domain crossing circuitry. This system ensures deterministic timing and minimizes latency or delay by providing a structured, synchronized interaction among five key components: reference clock pins, deserializers, computational circuitry, serializers, and a phase detection and adjustment circuit. Figure 2 illustrates an embodiment of the FPGA system described in the '305 patent.



FIG. 2

At a high level, the figure shows how incoming high-speed data is received (shown in red), processed inside the FPGA (2100, denoted with the dashed line), and transmitted back out (shown in blue), while a separate phase-control circuit monitors and aligns clock signals (shown in green). On the receive side (left side of the figure), a serial data stream and a reference clock are provided to FPGA transceiver banks (2102). A deserializer (2104) converts the incoming high-speed serial data into parallel data that can be processed inside the FPGA core (2106). At the same time, a receiver-side clock is generated based on the received reference clock. The parallel data and the

3

receiver-side clock are provided to computational logic (2210[1]) inside the FPGA core. That logic performs operations on the data while operating in the receiver clock domain. JA-34 at 11:3-43.

On the transmit side (right side of the figure), processed parallel data is sent to a serializer (2110). The serializer converts the parallel data back into a high-speed serial stream for output. Transmission is driven by a transmitter-side clock, which is derived from a reference clock input and associated clocking circuitry, including zero-delay buffer PLLs. Figure 2 also shows a phase detector (2206) and an external phase-control loop. The phase detector compares clock signals associated with the receive and transmit paths. Based on that comparison, a controller adjusts an oscillator or reference clock to reduce phase differences between the two paths. By using this external loop to align the clocks, the '305 patent eliminates the need for latency-heavy internal compensation, providing the tight synchronization required for high-speed data processing.[2]

Significantly, no clock domain crossing circuit, which necessarily delays signal processing, is used.

---

[1] Figure 2 shows the receive side computational logic 2210a and the transmitting side computational logic 2210b as a single element 2210 and explains that it can be the single component shown or a plurality of logic elements. JA-34 at 11:28-29.

[2] Jump Trading's allegations regarding what was "well-known when the '305 patent was filed" and its specific non-infringement contentions are both factually inaccurate, and legally irrelevant to the task of claim construction. Because these points do not bear on the narrow legal question of how a person skilled in the art would understand the claim terms, HFT declines to address these substantive allegations here.

## III. LEGAL STANDARDS

Claim terms are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in light of the intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012). "Terms that have a plain and ordinary meaning typically do not need to be construed, as their meaning is clear from the term itself." *Stryker Corp. v. Zimmer, Inc.*, 1:10-cv-1223, 2012 WL 333814, at *1 (W.D. Mich. Feb. 1, 2012). *See also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (affirming district court's adoption of the plain and ordinary meaning and declining further construction after rejecting Defendant's proposed construction).

## IV. DISPUTED TERMS

The parties dispute two terms, "configured to" and "operationally connected to." While the parties' proposed constructions are similar (Dkt. No. 54 at 9, 11), Jump Trading adds the further limiter "actually" to its proposed construction of "configured to" and reads out certain applications of its proposed construction of "operationally connected to." Each term is addressed in turn.

### A. "Configured To"

| HFT | Jump Trading |
| --- | --- |
| Plain and ordinary meaning, no construction is necessary. Should the Court find construction necessary, the plain and ordinary meaning is "programmed or implemented with hardware or software to" | Plain and ordinary meaning which is "***actually*** programmed or implemented with hardware or software to" |

As both sides agree, the term "configured to" should be given its plain and ordinary meaning. It is a common phrase used to describe components that are "programmed or implemented" to perform the recited function. Jump Trading's construction, however, inserts the word "actually" prior to this understanding, which Jump Trading then emphasizes in its brief. Dkt. No. 54 at 9 ("The plain and ordinary meaning of the phrase 'configured to' requires that the recited component be '*actually* programmed or implemented with hardware or software to' perform the claimed function.") (emphasis in the original). Given Jump Trading's inclusion of, and emphasis on, "actually" it is not clear what additional limitations Jump Trading seeks to place on the meaning of "configured to" beyond being programmed or implemented to. This uncertainty will only confuse the jury as to the plain English term and readily understood construction. In addition, given Jump Trading's argument that its proposed construction is purportedly dispositive of infringement (*id.* at 1), it appears to be seeking to require proof of a particular programming act or limiting the claimed configuration to a specific implementation, which is not supported by the construction nor the intrinsic record.

The parties agree that "configured to" should be accorded its plain and ordinary meaning and thus agree that the patentee did not act as a lexicographer or disclaim scope as to this term. *See Thorner*, 669 F.3d at 1365 ("There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."). The Cambridge Dictionary defines "configure" when used in the computing context as "to arrange or to make changes to a computer system, a piece of computer equipment or software, etc. to make it able to do a particular task or work in a particular way". Ex. A (Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/configured, last accessed February 26,

2026). This definition comports with the general understanding of the term and does not include any mention of being "*actually*" arranged or programmed.

The word "actually" does not appear anywhere in the intrinsic record and Jump Trading provides no citations or support from the record for its inclusion. While Jump Trading argues that "the specification is consistent" with its proposed construction (Dkt. No. 54 at 9), the specification provides no such support and does not teach or support the use of the word "actually" to narrow the claim scope. Instead, in every instance cited or quoted by Defendant, the specification simply uses the phrase "configure to" without further definition or gloss.

The asserted claims use "configured to" in a straightforward manner to describe the operation of identified FPGA components. For example, claim 1 of the '305 patent recites that various elements—including reference clock pins, data pins, deserializers, serializers, and computational circuitry—are "configured to" receive, convert, generate, and transmit signals. JA-42 at Cl. 1 ("first reference clock pin is configured to receive a first clock signal having a first frequency and a first phase;" "first plurality of data pins is configured to receive a first serial data stream;" "the deserializer is configured to convert the first serial data stream into a first plurality of parallel data streams having a first amount of data streams…"). The phrase appears throughout the specification of the '305 without any additional limiters or lexicography, particularly that there is "actual programming" or "actual implementation." For example, the specification explains that the deserializer is "configured to" convert a serial data stream into parallel data streams and generate a receiver side clock signal, and the first plurality of data pins is "configured to" receive a first serial data stream. JA-29 at 2:23-30. There is no discussion of it being "actually" configured to do so.

Jump Trading's only support for the inclusion of the word "actually" comes not from the intrinsic record, but rather only from two Eastern District of Texas cases, which addressed different patents, evidence, and arguments and arose in different procedural contexts. In *SIPCO, LLC. v. Abb, Inc.*, the relevant dispute focused on permissive language found in the specification that certain components "'may be configured to received … 'thus indicating the presence of a capability.'" No. 6:11-cv-0048-LED-JDL, 2012 WL 3112302 at *10–11 (E.D. Tex. July 30, 2012). The court found that the permissive construction urged by the Plaintiff rendered the claim "virtually devoid of meaning." *Id.* Here, the parties are in large agreement as to the meaning of the term, but only dispute Jump Trading's inclusion of, and emphasis on, "actually." In the only other authority cited by Jump Trading adopting its proposed construction, *Polaris PowerLED Tech., LLC v. Samsung Electronics America, Inc.*, the court did not construe the term during *Markman* at all. No. 2:17-cv-00715, Dkt. No. 333, at 3 (E.D. Tex. June 7, 2026). Instead, the court issued a *sua sponte* construction in response to the parties' motions in limine, adopting the intra-district holding from *SIPCO* and finding further support in the intrinsic record. *Id.*

In contrast, the other cases cited by Jump Trading did not include or rely on the word "actually" in their constructions. *See* Dkt. No. 54 at 10-11 ("*Radware Ltd. v. A10 Networks, Inc.*, No. C-13-02024-RMW, 2014 WL 1572644 at *12–13 (N.D. Cal. Apr. 18, 2014) (construing 'configured to' to mean 'programmed to [perform certain functions]'); *see also Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson*, No. 2:22-cv-00282-JRG-RSP, Dkt. No. 176 at 36 (E.D. Tex. Oct. 14, 2023) (following the Federal Circuit's opinion in *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1375 (Fed. Cir. 2022) and noting that 'a computer-implemented claim drawn to a functional capability requires some showing that the accused computer-implemented

device is programmed or otherwise configured, without modification, to perform the claimed function when in operation')."").

Other district courts, beyond even those identified by Jump Trading, have construed "configured to" even more broadly and did not include any requirement of "actual" programming or implementation. *See Traveller Innovations Ltd. v. Evenflo Co., Inc.*, No. 24-cv-1204, 2026 WL 161354 (D. Del. Jan. 21, 2026) (construing "configured to" as "capable of.") In *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, cited on page 11 of Jump Trading's brief, the court construed "adapted to" in light of the intrinsic record to mean "designed or configured to accomplish the specific objective." 672 F.3d 1335, 1349 (Fed. Cir. 2012). The court applied a narrower construction in light of the intrinsic record, but even there, did not include language that the element was "actually" designed or configured. *See also Nevro Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) (finding "'a signal generator configured to generate' means 'a signal generator programmed to generate'"). These decisions reinforce that the term "actually" should not be included in the plain and ordinary meaning.

Absent intrinsic support, Jump Trading's proposed construction does nothing more than inject uncertainly into a clear term and clear construction. The claims merely require the recited structures be "configured to" perform the stated function; in other words, are "programmed or implemented with hardware or software to" perform the stated function. Jump Trading's proposed addition of "actually" creates a risk of confusing the jury without providing any further guidance. This Court should not add this unnecessary modifier to what should otherwise be a clearly understood term of ordinary English parlance. *See Oplus Techs., Ltd., v. Funai Elec. Co., Ltd.*, No 11-cv-09027 (Sept. 13, 2013) (rejecting inclusion of "complete" from the construction of "pixel" where the modifier "provides no clearer understanding of what a pixel is in the context of the

[asserted] patent" and "tends to raise more questions about the meaning of what a pixel is than it answers").

For the reasons provided above, the Court should adopt the plain and ordinary meaning and either decline to further construe the term, or construe the term as plain and ordinary meaning, which is "programmed or implemented with hardware or software to."

### B. "Operationally Connected To"

| HFT | Jump Trading |
|---|---|
| Plain and ordinary meaning, no construction is necessary. Should the Court find construction necessary, the plain and ordinary meaning is "connected, directly or indirectly, such that the connection allows the performance of the recited function" | Plain and ordinary meaning which is "connected such that the connection allows the performance of the recited function" |

Again, both sides agree the term "operationally connected to" should likewise be given its plain and ordinary meaning. The parties are again close in their constructions, but Jump Trading's briefing makes clear that it seeks to inject further limitations on the term. While advocating for the plain and ordinary meaning of the term, Jump Trading argues that "operatively connected to" "requires more than just a generic physical or electrical connection" between the claimed components and that the "connection is one that makes the recited function possible." Dkt. No. 54 at 11-12. Thus, Jump Trading seeks to superimpose on its proposed construction additional unstated limitations by arguing that the specification describes components as "operationally connected to" one another "for the express purpose of transmitting signals and performing specific functions." *Id.* at 13. Within three pages of briefing, Jump Trading leaps from the plain language of "operationally connected" to (1) exclude physical and electrical connections, (2) disallow the connection from serving any other purpose, and (3) exclude configurations that include other components in making the connection. *Id.* at 11-13. This overlay is unsupported and simply wrong.

Thus, HFT respectfully requests that the Court make clear that these additional narrowing limitations are not part of the construction and further that the connection allows for both direct and indirect connection. Accordingly, "operationally connected to" should be construed accordingly to its plain and ordinary meaning, which is "connected, directly or indirectly, such that the connection allows the performance of the recited function."

As explained by the Federal Circuit in Jump Trading's primary authority, *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, "operationally connected to" is a "general descriptive term frequently used in patent drafting to reflect a functional relationship between claimed components. ***Generally speaking, and as used in the [asserted] patent, it means the claimed components must be connected in a way to perform a designated function***." 381 F.3d 1111, 1118 (Fed. Cir. 2004).[3] The Federal Circuit applied the plain and ordinary meaning of the phrase in "operatively connected to" in the absence of significant modifiers in the intrinsic record denoting a narrower meaning. *Id.*; *see also Hunter Douglas Inc. v. Great Lake Woods, Inc.*, 17 Markman 11673680, 2017 WL 11673680, *4 (D. Colo. 2017) (applying teachings from *Innova* and applying plain and ordinary meaning to "operatively connected" and declining further construction). In *Innova*, the court concluded that the claimed tube was "operatively connected" to the claimed cap "when the tube and cap are arranged in a manner capable of performing the function of filtering." *Id.* at 1120. The Federal Circuit did not include further limitations as to the type of connection (whether direct or indirect) or exclusive use requirements.

---

[3] The Federal Circuit construed the term "operatively connected" in *Innova.* Both parties agree that the term has a similar meaning to "operationally connected" and both rely on *Innova* for guidance. *See* Dkt. No. 54 at 13 (relying on *Innova* to support its construction).

Jump Trading's additional limitations—"requir[ing] more than just a generic physical or electrical connection," "mak[ing] the recited function possible," and serving "the express purpose of transmitting signals and performing specific functions" (Dkt. No. 54 at 11-13)—are not supported even by Jump Trading's own construction. "Connected such that the connection allows the performance of the recited function" does not include any of the limitations or restrictions that Jump Trading urges elsewhere in its brief.

Moreover, these additional restrictions are unsupported by, and indeed contrary to, the intrinsic record. First, Jump Trading's argument that a "generic physical or electrical connection" cannot "operationally connect" the claimed components would read out embodiments of claimed invention which expressly contemplate either direct or indirect connections. For example, Figure 2 is a block diagram of an FPGA in accordance with an embodiment of the claimed invention. JA-32 at 7:65-67. In Figure 2, the "deserializer 2104 received a serial data stream via a first plurality of data pins in a first interface from the I/O module 2120…." JA-34 at 11:17-20. "In embodiments, the I/O module 2120 may be a direct soldered cable, on-chip optics, or an on-board transceiver, to name a few." *Id.* at 11:37-39. The patent further explains that in embodiments, the "first plurality of data pins may be operationally connected [to] deserializer 2104" and "may also be connected to I/O module 2120 such that a first serial data stream may be transmitted from external connection 2122 to deserializer via the I/O module 2120 and the first plurality of data pins." *Id.* at 12:7-14. Thus, contrary to Jump Trading's proposed limitations on its construction, the patent makes clear that the claimed "deserializer operationally connected to the first reference clock pin to receive as a first reference clock signal" can be connected in any number of ways, both directly and indirectly.

Second, Jump Trading argues that, under its proposed construction, the claimed connection alone is responsible for performing the claimed function, placing undue (and unclear)

emphasis on "allows the performance." Jump Trading adds an additional requirement that the connection between the recited components is the sole contributor to the performance of the function and further was made for the "express purpose" of performing the claimed function (Dkt. No. 54 at 12-13). But the claims themselves make clear that components and connections can serve multiple purposes. For example, in Claim 1, the adjustable oscillator is operationally connected to the phase controller and second reference clock and configured to: "(A) receive the adjustment information; (B) generate the second clock signal…; and (C) transmit the second clock signal to the second reference clock pin…."

Jump Trading provides no support, whether intrinsic or extrinsic, for the additional restrictions that it argues should be placed upon the term "operationally connected to." While Jump Trading provides multiple citations to the specification (Dkt. No. 54 at 12-13), the excerpts in question simply reiterate the claim language as written, namely using the term "operationally connected to." The specification does not alter the term, let alone rewrite it in the manner proposed by Jump Trading. Indeed, as shown above, the specification expressly contemplates multiple forms of connection, including indirect.

As described above, the Federal Circuit has repeatedly found that phrases such as "operatively connected," "operably coupled," and similar linkage terms are generally treated as having their ordinary meaning and are not narrowly construed. District courts applying the Federal Circuit's guidance have likewise declined to narrow such terms in the manner Jump Trading urges. For example, in *World Wide Stationery Mfg. Co. Ltd. v. U.S. Rung Binder, L.P.*, 4:07-cv-1947, 2009 WL 2982904 (E.D. Miss. Sept. 14, 2009), the court addressed the term "operatively coupled," rejecting attempts to limit it to a specific type of physical or direct connection. The court held that the phrase meant "arranged in a manner capable of performing a designated function." *Id.* at *14.

9

*See also Bonutti Research, Inc. v. Lantz Med., Inc.*, 1:14-cv-00609, 2016 WL 247752, *20 (S.D. Ind. Jan. 21, 2016) (declining to adopt narrowed construction and holding "'operatively coupled' requires that the named parts be connected in such a manner so as to perform their designated function"); *Embrex, Inc. v. Breuil, SA*, 2005 WL 8159294, *8 (E.D.N.C. Nov. 18, 2005) (rejecting definition of "operatively connected" that "requires an electronic or physical connection that is not seen within the context of the intrinsic record" and construing the term as "arranged in a manner capable of performing the [claimed] function"). These decisions reflect the consistent approach in claim construction to this term: absent intrinsic evidence requiring restriction, such language should not be rewritten to impose particular wiring or software configurations or direct physical coupling requirements.

For the reasons expressed above, HFT respectfully requests that the Court adopt its proposed interpretation of "operationally connected to" so as to make clear that either direct or indirect connections are included, and further that Jump Trading's additional restrictions are not part of the construction. Thus, this Court should construe "operationally connected to" in light of the plain and ordinary meaning and decline to further construe the term, or construe it as plain and ordinary meaning, which is "connected, directly or indirectly, such that the connection allows the performance of the recited function."

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court adopt the plain and ordinary meaning of "configured to" and "operationally connected to" as provided herein.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Dale Chang*
Marc Fenster
Brian Ledahl
Dale Chang
Paul Kroeger
Joshua Sheufler
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF HFT
SOLUTIONS, LLC**

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, I electronically filed the foregoing document with the Clerk of the Court for the Northern District of Illinois using the ECF System which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

/s/ *Dale Chang*
Dale Chang